## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CHEM-TROL, INC.,
a Kansas corporation

                *Plaintiff,*

  vs.                              Case No. 09-2024-EFM

LYLE A. CHRISTENSEN and
MIDWEST SPRAY TEAM & SALES, INC.,

                *Defendants.*

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Chem-Trol, Inc's ("Chem-Trol") Motion for Preliminary Injunction (Doc. 2) against Defendant Lyle A. Christensen ("Mr. Christensen") and Defendant Midwest Spray Team & Sales, Inc. ("Midwest").  An evidentiary hearing was held on February 2, 2009, after which the Court took the matter under advisement.  Plaintiff Chem-Trol appeared by its owner, Joseph A. White ("Mr. White"), and through counsel, Scott C. Nehrbass of Foulston Siefkin, LLP.  Defendant Christensen appeared in person and through counsel, David L. Charles of Crowley Fleck, LLP, and Defendant Midwest appeared by its owner, Defendant Christensen and through counsel, Mr. Charles.  Following the evidentiary hearing both parties filed post-trial briefs on February 5, 2009 for the Court's consideration in its ruling. For the reasons set forth herein, Plaintiff's motion is granted.

-1-

## I. Background[1]

Chem-Trol is a Kansas corporation in good standing and is owned and operated by Mr. White, a Kansas resident.  Chem-Trol is in the vegetation management business and, through its employees and agents, controls and applies chemicals and other inhibitors to unwanted vegetation for customers throughout Kansas, Missouri, Oklahoma, Iowa, and other surrounding states. Chem-Trol's customer base includes, but is not limited to, large rural electric cooperatives ("REC") and other utilities that require enormous amounts of sophisticated vegetation management for maintenance of their right of ways and utility easements.

In the conduct and as part of its business, Chem-Trol acquires extensive knowledge and information regarding each customer and its vegetation management needs, and determines the most efficient and effective method for satisfying each customer's specific vegetation management needs.  Chem-Trol's business model is designed around becoming invaluable to the customer.  It capitalizes on the customer's natural inclination to stay with a proven and reliable company the customer knows can satisfy its vegetation management needs rather than having to re-educate and take a risk on a different company that does not have a track record of experience, reliability, and trustworthiness with the customers.  Further, Chem-Trol encourages and fosters close relationships and goodwill between the customers and its Area Managers through visiting and entertaining customers, and through other activities designed to gain the customer's friendship and trust to maximize the chance for repeat business and development of a longstanding customer relationship.

---

[1]The Background is compiled from testimony provided during the evidentiary hearing, the Court's previously issued Temporary Restraining Order, Chem-Trol's post-trial brief, and defendants' proposed preliminary injunction order.

Chem-Trol also acquires, develops, and uses a variety of other confidential business information, including, but not limited to, referral sources and customer lists, customer bidding and pricing information, other customer and account information, sources of customer leads, supplier information, techniques, plans, materials, and marketing methods and strategies. This information is hereafter referred to collectively as "Confidential Business Information."

Chem-Trol was founded in 1964 by Darrel Odle ("Mr. Odle") and Glen "Bud" Tolman, Jr ("Mr. Tolman"), but was sold many years later to Mr. White, who prior to purchasing the company, served as Chem-Trol's Area Manager for the company's Wichita, Kansas branch. Mr. Odle, however, continues to regularly serve Chem-Trol in a consulting capacity.

Mr. Odle and Mr. Tolman started Chem-Trol to fill a perceived need for vegetation management services on the part of large utilities, including REC's and other companies in the Midwest. As it grew, Chem-Trol's business expanded both geographically and in terms of the services it provided. Eventually, Mr. Odle and Mr. Tolman decided to establish an Iowa branch office. In November 1981, they hired Mr. Christensen, an Iowa native then living in the Kansas City area, as an Area Manager to establish that office. Mr. Christensen eventually started the Iowa office in December 1981, inheriting the customer base Mr. Odle had started. Mr. Christensen took over all the sales and operations of the Iowa region, which included traveling and working with customers throughout the entire state of Iowa and in some surrounding states, including Nebraska, Minnesota, and North and South Dakota.

Area Manager is a key position and includes building and maintaining relationships with Chem-Trol's most important customers and sources for business referrals, including large utility REC's. In his role as Area Manager and otherwise, Mr. Christensen had the responsibility of

-3-

marketing Chem-Trol products and services, and developing and maintaining Chem-Trol's customer base in what was known as the Iowa region.  In addition, he was privy to Chem-Trol's Confidential Business Information, including but not limited to information regarding Chem-Trol's Iowa region customers' vegetation management needs and Chem-Trol's bidding and pricing methods with respect to each customer.  Over his approximately twenty-seven years of employment and through his work and experience with Chem-Trol's customers, Mr. Christensen developed close relationships with Chem-Trol's customers and acquired and utilized Chem-Trol's Confidential Business Information relating to Chem-Trol, its Iowa region customers, those customers' vegetation management needs, and the pricing and bidding for each of those customers.

When Mr. Christensen began his employment on or about November 3, 1981, he executed a Contract of Employment with Chem-Trol that contained noncompetition and nonsolicitation provisions.  The noncompetition covenant in this original contract was centered in Kansas City.  Later, on or about December 17, 1987, when Mr. Christensen had established himself as Chem-Trol's Area Manager of the Iowa business unit, he executed a new Contract of Employment with Chem-Trol ("Contract of Employment"), that included an increase in pay, additional restrictive covenants, and changed the center-point of the noncompetition covenant to Hamlin, Iowa.  In exchange for signing this new Contract of Employment, which was a condition to Mr. Christensen's continued employment with Chem-Trol, Mr. Christensen received both the increase in pay as specified in the new Contract of Employment along with the ability to continue working for Chem-Trol.  Mr. Christensen read the contract and signed it voluntarily, knowing that doing so was a condition of maintaining his employment with Chem-

Trol.

Paragraph 3 of the Contract of Employment, and subparagraphs 1 through 5 of Paragraph 3 of the Contract, contained the following restrictive covenants:

3. It is further specifically agreed by Employee that in the event of termination of this employment by either party with or without cause, that for a period of two (2) years after such termination, Employee shall not go into business alone or in conjunction with one or more others, or in the employ of any other person or legal entity where the business of such employment shall be the same or similar to that of Employer, within a 250 mile radius of Hamlin, Iowa.

Employee further agrees within the above time period and within the mileage radius as set out above, agrees to refrain from:

1. Soliciting any active or paid up customers of company;

2. From transmitting or revealing any information, written or oral, concerning the active or paid up accounts of company, or method of operation, or types of business forms of company to a competitor or use the same for himself or others in the same or similar employment.

3. It is further specifically agreed by the Employee that he will not at any time either during the terms of this agreement or thereafter divulge to any person, firm or corporation any information received by him during the course of his employment with regard to the personal, financial or other affairs of the Employer and all such information shall be kept confidential and shall not in any manner be revealed to anyone.

4. Employee specifically agrees that he will return all merchandise, equipment, books, documents, and other trade secrets to the Employer in the event of termination.

5. Employee further agrees that he will not within two (2) years after termination of this contract divert or attempt to divert, directly or indirectly, any business whatsoever from said Employer, and particularly not by influencing or attempting to influence any of the customers with whom he may have had dealings.

As part of his responsibilities, Mr. Christensen traveled to or worked with Chem-Trol customers throughout the territory roughly covered by the 250-mile radius around Hamlin, Iowa,

although not including any parts of Missouri or Kansas.  Occasionally, Mr. Christensen traveled outside this radius to service Chem-Trol's customers.

On or about August 13, 2008, Chem-Trol terminated Mr. Christensen.  When terminating Mr. Christensen, Chem-Trol reminded him of his obligations under the Contract of Employment, particularly his obligation not to compete.  On or about December 18, 2008, Mr. Christensen formed Midwest as an Iowa corporation, of which he and his wife, Lisa Christensen, are the only shareholders and officers.  Midwest's office is located at Mr. Christensen's residence in Clive, Iowa.  Midwest's business purpose is to provide agricultural spraying and related activities, which is the same or similar as Chem-Trol provides to its customers.

Since its incorporation and being full aware of Mr. Christensen's non-compete provision in his Contract of Employment with Chem-Trol, Midwest has signed contracts to provide vegetation management services with eleven of Chem-Trols REC customers, has received responses to bids from seven other of Chem-Trol's REC customers, and currently has four other outstanding bids to Chem-Trol's REC customers that it has yet to receive replys.

## II. Preliminary Injunction Standard

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."[2]  The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case."[3]  Whether to grant or deny a preliminary injunction rests

---

[2]*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *SCFC ILC Inc. v. Visa USA Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)).

[3]*Tri-State Generation & Transmission Ass'n., Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986).

within the discretion of the district court.[4]

To be entitled for a preliminary injunction, the moving party must demonstrate: (1) that the movant will suffer irreparable injury unless the injunction issues; (2) that the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing parties; (3) that the injunction, if issued, would not be adverse to the public interest; and (4) that there is a substantial likelihood that the movant will eventually prevail on the merits.[5]  The Tenth Circuit has adopted a liberal standard for the "probability of success" requirement where the movant prevails on the other factors.[6]  In such case, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."[7]

### a.  Irreparable Harm

For an injury to constitute irreparable harm, it must be "certain, great, actual and not theoretical."[8]  There must be a significant risk of harm that cannot be remedied by an award of monetary damages because of difficulty or uncertainty in their proof or calculation.[9]  The burden

---

[4]*Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940); *Three Ten Enters, Inc. v. Berrenberg Enters, Inc.*, 1994 WL 243773, at *1 (D. Kan. May 13, 1994).

[5] *Schrier*, 427 F.3d at 1258; *see also Resolution Trust Corp. v. Cruce*, 783 F. Supp. 1309, 1310-11 (D. Kan. 1992), *aff'd*, 972 F.2d 1195 (10th Cir. 1992); 11A Wright & Miller, § 2948.

[6]*Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).

[7]*Id.*

[8]*Schrier*, 427 F.3d at 1267 (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003)); *see also Butler v. Nat'l Collegiate Athletic Ass'n*, 2006 WL 2398683, at *1 (D. Kan. Aug. 15, 2006) (stating that the harm claimed cannot be speculative).

[9]*Flying Cross Check, L.L.C. v. Central Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1259 (D. Kan. 2001) (citing *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990)).

is on the party seeking the preliminary injunction to demonstrate that "the injury complained of is such imminence that there is a clear and present need for equitable relief."[10]

Proving irreparable harm is the most important factor for obtaining a preliminary injunction.[11]  However, "loss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm."[12]  While wholly conclusory allegations alone will not suffice to prove injury, unfair competition resulting from a breach of a covenant not to compete is likely to constitute irreparable harm.[13]

Chem-Trol complains that it has suffered irreparable harm through defendants' solicitation of, and entering into, contracts with a number of Chem-Trol's Iowa REC customers to provide vegetation management services in violation of Mr. Christensen's non-compete agreement.  Chem-Trol further asserts that in addition to the customers that defendants have already contracted with to provide services, they have solicited additional Chem-Trol customers with whom they are prepared to enter into service agreements if a preliminary injunction is not issued, which will cause further irreparable harm to its business.

Chem-Trol has presented evidence on the difficulty of and time required for a new manager to enter into the market and build the customer relationships required to maintain its

---

[10]*Heideman*, 348 F.3d at 1189.

[11]*Hill's Pet Nutrition, Inc. v. Nutro Prod., Inc.*, 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003).

[12]*Flying Cross*, 153 F. Supp. 2d at 1259 (citing *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1181 (D.Kan. 1988); *see Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1108 (D.Kan. 2000) (finding irreparable harm due to "extreme difficulty and uncertainty in restoring goodwill among customers and regaining the business of customers")).

[13]*See Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) (holding that irreparable harm can be inferred from insurance sales representatives' breach of non-competition covenant); *accord Hill's Pet Nutrition*, 258 F. Supp. 2d at 1205.

customer base.  Mr. Christensen's time and experience with Chem-Trol has permitted him to

forge close relationships with Chem-Trol's customers.  By his own testimony, Mr. Christensen

acknowledged that Chem-Trol's REC customers considered him a friend and were inclined to

call him, which is a relationship that his Chem-Trol replacement did not have.  Without adequate

time to introduce a new manager to the area and its customers, Chem-Trol will continue to suffer

customer losses as a result of Mr. Christensen's and Midwest's relationships with Chem-Trol

customers - a relationship they gained from Mr. Christensen's employment at Chem-Trol.

Chem-Trol also contends that it is unable to calculate money damages resulting from

these customer losses, or any future customer loss, due to the complexity of business operations,

loss of employment that could occur as a result of the lost revenue, and the difficulty of assessing

future income from these customers.

Defendants deny that Chem-Trol has suffered any harm because they claim that Chem-

Trol had abandoned the REC customers that defendants have agreed to provide vegetation

management services.  Defendants also deny soliciting any of Chem-Trol's customers in

violation of the non-compete agreement, arguing that all of Chem-Trol's customers that it has

entered into service agreements contacted them first and not vice-versa.  In addition, defendants

contend that even if Chem-Trol has been harmed by their acts, Chem-Trol has a sufficient legal

remedy through assessment of monetary damages, and thus, a preliminary injunction is

unwarranted.

Chem-Trol's owner, Mr. White, testified that since Mr. Christensen formed Midwest, he,

and ultimately Midwest, have solicited and entered into contracts to provide vegetation

management services to eleven of Chem-Trol's REC customers, all in violation of the non-

compete agreement.  In emphasizing the importance of these customers to Chem-Trol, Mr. White

described them as very consistent customers whose business does not fluctuate with the

economy, and thus, are a steady source of income for the company.  Mr. White further explained

the time commitment required for building the relationship necessary to not only retain its

customers, but also to provide efficient and effective service, making it difficult and potentially

costly to replace these customers or estimate damages if they are lost.  During Mr. Christensen's

testimony, he confirmed that he has entered into service agreements with eleven of Chem-Trol's

REC customers.  Moreover, Mr. Christensen testified that he has received bids from four

additional Chem-Trol REC customers, and he has submitted bids to seven other Chem-Trol

customers that he is awaiting a response.  He further stated that actions regarding these

additional customers are on hold pending the outcome of Chem-Trol's preliminary injunction

motion.  Defendants, however, argue that they did not solicit these customers, but all of these

customers first came to them because Chem-Trol failed to provide them with timely bids, and

because they knew Mr. Christensen from their past professional relationship.  In fact, Mr.

Christensen acknowledged that he was "Chem-Trol" in Iowa, that he knew the customer's needs,

and that the customers trusted him.

Chem-Trol's harm in this case is certain.  It has lost eleven of its REC customers to date,

and as confirmed by Mr. Christensen's own testimony, stands to immediately lose from four to

eleven additional REC customers if the preliminary injunction is not granted.  Loss of customers,

especially long term customers in which goodwill has been developed through the years, creates

irreparable harm.[14]  Mr. Christensen has developed close and personal relationships with Chem-Trol's customers such that he poses a substantial risk of diverting a large part of those customer's business away from Chem-Trol, as well as the loss of goodwill.  Chem-Trol cannot adequately calculate damages from such loss, nor can it estimate the future effect of other customers who might also be lost upon finding that their business-peers have moved their business from Chem-Trol to Midwest.[15]  The Court, therefore, finds that Chem-Trol has met its burden in proving an imminent threat of irreparable harm.

### b. Balance of Hardships

Having determined the harm that Chem-Trol will suffer if the preliminary injunction is not issued, the Court must next weigh that harm against any harm to the defendants should the preliminary injunction be granted.[16]  As the foregoing discussion of irreparable harm illustrates, the harm to Chem-Trol in the absence of a preliminary injunction would be great.  Chem-Trol stands to lose immeasurable revenue in addition to losing the goodwill established in the region through its customer relationships.  If this preliminary injunction does not issue, Chem-Trol may continue to suffer irreparable harm due to defendants' use of the confidential information learned and professional relationships established through Mr. Christensen's Chem-Trol employment, which would adversely impact Chem-Trol's Iowa region business, and ultimately, affect the jobs of its remaining employees.

---

[14]*Fireworks Spectacular*, 86 F. Supp. 2d at 1109 ("'Customer contacts' is a legitimate interest to be protected by a covenant not to compete where the employee's relationship with the employer's customers is such that there is a substantial risk that the employee may be able to divert all or part of the employer's business."). *Id.*

[15]*See Hill's Pet Nutrition*, 258 F. Supp. 2d at 1205-06 (citations omitted) (explaining that a harm is irreparable if money damages are an inadequate remedy because of difficulty or uncertainty in their proof or calculation).

[16]*Heideman*, 348 F.3d at 1190 (citing *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001)).

Mr. Christensen claims that he will suffer greater hardship if the preliminary injunction issues.  In explaining his position, Mr. Christensen points to the present economy and asserts that he has attempted to obtain employment for over three months, but has been unable to locate work.  He indicates that he only knows the vegetation management business because that is all he has done for the past twenty-plus years for Chem-Trol, and expressed the hardship of going into another line of work.  In addition, he argues that his wife only works part-time, and he has a minor child at home that requires medical care, which would make moving from the area difficult.

While the Court is sympathetic to Mr. Christensen's difficulty in finding employment and his home situation, the Court finds that on balance, the likely hardship to either Mr. Christensen or Midwest is sufficiently outweighed by the harm to Chem-Trol.  As discussed further below, the covenent not-to-compete does not prevent Mr. Christensen or Midwest from operating their business to provide vegetation management products to end users, including Vegetation Management Supply, Inc's ("VMS") customers in competition with VMS.  Defendants, therefore, have an avenue to obtain income during the period the preliminary injunction is in effect.  Further, a bond requirement should adequately protect any damage to Midwest and Mr. Christensen should Chem-Trol not prevail at trial.

### c. Public Interest

The Court next considers whether granting the preliminary injunction will adversely affect public interest.  The enforcement of valid contracts is in the public interest.[17]  Moreover,

---

[17]*Fireworks Spectacular*, 86 F. Supp. 2d at 1109.

the public interest is served where unfair competition is restrained.[18]  Defendants contend that

the public interest will be harmed if the preliminary junction is granted because doing so would

affect the contracts it has entered into with the REC customers, adversely impacting their

businesses along with the relevant Iowa community.  Chem-Trol, however, asserts that there is

no public interest that would be affected, with which the Court is inclined to agree.  Because

defendants executed their contracts with Chem-Trol's REC customers knowing of Mr.

Christensen's covenant not-to-compete, defendants' argument that a preliminary injunction

would now adversely affect those contracts is without merit.[19]

### d. Likelihood of Success on the Merits

Chem-Trol seeks to enjoin Mr. Christensen and Midwest from breaching Mr.

Christensen's covenant not-to-compete pursuant to his Contract of Employment.  Specifically,

Chem-Trol seeks a preliminary injunction prohibiting defendants from soliciting or diverting,

either directly or indirectly, Chem-Trol's customers, or operating a business similar to that of

Chem-Trol in the 250 mile radius as set forth in the Contract of Employment.

A district court sitting pursuant to diversity jurisdiction must apply the choice of law

rules of the forum state.[20]  Therefore, Kansas law governs construction of the covenant not-to-

compete.  Under Kansas law, the place of contract governs breach of contract actions.[21]  Chem-

Trol contends that the Contract of Employment was executed in Kansas, and because neither

---

[18]*Id.*

[19]In his testimony, Mr. Christensen admitted that he executed contract with the REC customers knowing it was in competition with Chem-Trol, and with full knowledge of the covenant not-to-compete in his Employment Contract with Chem-Trol, but he did it anyway.

[20]*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[21]*Dow Chem. Corp. v. Weevil-Cide Co. Inc.*, 630 F. Supp. 125, 127 (D. Kan. 1986).

defendant has presented any credible evidence to controvert that assertion, the Court will apply Kansas law in resolving the issues.

### 1. Breach of Employment Contract

Defendant Christensen, and therefore Midwest, does not dispute that the covenant not-to-compete was in place at the time he negotiated with and entered into contracts with the REC customers. He does, however, argue that the covenant in the Contract of Employment is not enforceable because there was no additional consideration when he signed it, and because both the scope of the 250 mile radius and the two year limitation is unreasonable.

Mr. Christensen's argument that the noncompetition agreement is unenforceable because of inadequate consideration at the time it was signed fails for numerous reasons. First, the law is clear that continued employment is sufficient consideration to uphold a covenant not-to-compete.[22] The first contract Mr. Christensen signed upon the commencement of his employment ("1981 Contract") contained a covenant not-to-compete, the consideration of which was clearly the hiring for his job. In addition, Mr. Christensen, after signing the 1981 Contract with the noncompete provision, was given control over Chem-Trol's Iowa region, where he was provided information and control over the bidding process to the region's customers, all of which would not have occurred had he declined to enter into the agreement. Mr. White testified that the 1987 Contract of Employment was executed in part to update and maintain a 250 mile radius from Hamlin, Iowa rather than the greater Kansas City area since Mr. Christensen was based in Iowa. Moreover, Mr. White testified that the salary indicated in the 1987 contract was an increase in pay for Mr. Christensen from his annual salary prior to signing the contract. Mr.

---

[22] *Puritan-Bennett Corp. v. Richter*, 8 Kan. App. 2d 311, 315, 657 P.2d 589, 592 (1983).

Christensen admitted that he would likely have lost his job had he not signed the contract with the covenant not-to-compete.  Thus, for the foregoing reasons, the Court finds adequate consideration for the Contract of Employment.

Kansas law generally recognizes the validity of a noncompetition agreement that is ancillary to an employment contract if it is reasonable and not adverse to the public interest.[23] The "[f]reedom of contract is the driving force behind finding such covenants enforceable."[24] Noncompetition agreements are valid and enforceable when four conditions are met: (1) the covenant must protect a legitimate business interest; (2) the covenant must not create an undue burden on the employee; (3) the covenant must not be injurious to the public welfare; and (4) the time and territorial limitations must be reasonable.[25]  Reasonableness is determined by the facts and circumstances of each particular case.[26]  In addition, a noncompetition agreement in an employment contract is to be strictly construed against the employer.[27]

### a. Legitimate Business Interest

Midwest and Mr. Christensen argue that Chem-Trol has no legitimate business interest for the noncompetition agreement, and the sole reason for the provision is to avoid ordinary competition.  Defendants further argue that the bidding process has changed since Mr. Christensen left employment, and therefore, his knowledge in that area cannot be considered a protected business interest.  Further, Mr. Christensen contends that because the identity and

---

[23]*Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 762, 112 P.3d 81, 86-7 (2005).

[24]*Varney Bus. Servs., Inc. v. Pottroff*, 275 Kan. 20, 34, 59 P.3d 1003, 1015 (2002).

[25]*Weber v. Tillman*, 259 Kan. 457, 464, 913 P.2d 84, 90 (1996).

[26]*Id.*, 913 P.2d at 90.

[27]*Id.* at 462, 913 P.2d at 89.

location of Chem-Trol's customers can be learned by competitors from county or local university records, this knowledge cannot constitute a business interest in which Chem-Trol can rely. Moreover, Mr. Christensen asserts that because Chem-Trol has no formal training or training manual with respect to bidding or other customer relation matters, those areas cannot be considered legitimate business interests. Chem-Trol asserts that the noncompete provision protects its interests in its close customer relationships and the extensive knowledge Mr. Christensen obtained through his employment of each customer's specific vegetation management needs.

The Court must conclude that Mr. Christensen's quick ability to obtain the contracts with the former Chem-Trol REC customers was solely because of his prior association with Chem-Trol. In fact. Mr. Christensen's claim that the customers called him because they had not heard from Chem-Trol is evidence of the Court's conclusion: the customers called Mr. Christensen as a result of their past association with him to find out why they had not heard from Chem-Trol and what should be done about it.[28]

While Chem-Trol may not have provided Mr. Christensen with formal training or a training manual regarding the bidding process or other business function, it is beyond dispute that Mr. Christensen's expertise in bidding and providing vegetation management to large right-of-way customers, such as the REC's, is knowledge and a skill not readily attainable by the general public, and which Mr. Christensen did not bring to but learned from his Chem-Trol employment. The fact that Chem-Trol may now be using a different bid calculation to which

---

[28]The Court further finds Mr. Christensen's claim that he did not solicit customers, but instead, they called him first legally irrelevant. The fact that Mr. Christensen and Midwest were available for and receptive to calls is sufficient "solicitation." The Court further notes that the covenant not-to-compete is more broad than merely being a "no-solicitation" clause, and therefore, this argument is without merit.

Mr. Christensen is unfamiliar does not change the fact that what he knows about Chem-Trol's process and customers, he learned from his association with Chem-Trol.

Mr. Christensen's claim that the identity of potential customers for vegetation management can be obtained from sources other than Chem-Trol is also unpersuasive. While that assertion may be true, doing so would obviously take time and would require the knowledge to know what to ask and of whom to ask it. Mr. Christensen already knew most of this information solely because of his association with Chem-Trol. Further, Mr. Christensen testified that the only advantage he had other than his relationship with the Chem-Trol customers - a relationship he admitted, at least tacitly, he obtained from his employment with Chem-Trol - was his reputation for honesty and loyalty. Although that reputation is his, he earned it while working for Chem-Trol. Stated another way, but for his employment with Chem-Trol, Mr. Christensen would not have his reputation with these customers, nor would they possess any knowledge of Mr. Christensen or his reputation. The best evidence of this goodwill that Mr. Christensen was allowed to develop on Chem-Trol's behalf is the fact that the Chem-Trol customers called Mr. Christensen and offered him contracts after he formed his new company. That goodwill, which Chem-Trol values, is a protectable business interest for Chem-Trol.

In light of the foregoing, the Court finds that Chem-Trol has met its burden of showing a legitimate business interest warranting protection through a preliminary injunction.

### b. Undue Burden on Employee

The Court is mindful of the burden on Mr. Christensen, and ultimately, Midwest in enforcing the covenant not-to-compete. However, as previously discussed, the burden of not enforcing the covenant weighs heavier on Chem-Trol than on either defendant. In addition to the

aforementioned arguments relating to burden on defendants, Mr. Christensen argues that the geographic scope and duration of the covenant are unreasonable.  The Court addresses each in turn below, but ultimately finds both the 250 mile radius and two year limitation reasonable.

### c. Injury to the Public

Defendants argue that Chem-Trol's sole reason for the noncompete agreement is to avoid ordinary competition, which ultimately injures the public.  In addition, defendants assert that enforcement of the noncompete would cause injury to the REC customers that it has already entered into contracts to provide services.  Because each REC is required to budget in advance for its vegetation management contracts, defendants contend that enforcing the noncompete would now have a negative economic impact on those businesses.

The Kansas courts recognize that companies have an interest in protecting both confidential business information and preventing unfair competition.[29]  The Kansas Supreme Court has stated that where the "contract is not violative of any positive statute or rule of law[,] [i]t is the duty of the courts to sustain the legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose. It has also been said, and we think rightly, the paramount public policy is that freedom to contract is not to be interfered with lightly."[30]

As we have pointed out, the noncompete provision protects a legitimate business interest of Chem-Trol.  Also as previously discussed, the covenant is clearly intended to accomplish more than just to stifle ordinary competition as defendants suggest.  In addition, the effect on the

---

[29]*See Idbeis*, 279 Kan. at 766-67, 112 P.3d at 89.

[30]*Weber*, 259 Kan. at 463, 913 P.2d at 89.

-18-

REC's with regard to enforcing the covenant, taking into consideration that the contracts were formed in violation of and with knowledge of the covenant by defendants, has little effect with regard to this analysis.  Accordingly, the Court finds that the covenant not-to-compete is not violative of public policy.

### d. Time and Territory Limitations

Defendants contend that the scope of the noncompete provision is unreasonable because it prohibits competition for 2 years within a 250 mile radius of Hamlin, Iowa, which essentially, reaches into states surrounding Iowa.  When deciding whether time and territorial limitations within a covenant not-to-compete are reasonable, the Court looks at the facts of the entire case.[31]  However, the restrictions of a noncompetition clause "must be no greater than necessary to protect the employer's interests."[32]

The covenant in question precludes Mr. Christensen from competing or soliciting customers of Chem-Trol for two years after termination of his employment with Chem-Trol.  Mr. White testified that the two year restriction is necessary due to the time period it typically takes for a new manager to establish relationships with either existing or new customers.  Without such a time restriction, Chem-Trol asserts that a person leaving employment and competing for the same customer base would have such an unfair advantage in the region that a new manager would have no possibility of establishing sufficient relationships to sustain the business.  Mr. Christensen similarly testified that it would take a person one to two years to achieve the type of relationship he had with the customers.

---

[31]*Id.* at 462, 913 P.2d at 89.

[32]*Id.* at 466, 913 P.2d at 91.

Two year covenants not-to-compete are widely found to be reasonable in Kansas noncompetition clauses,[33] and on the facts of this case, taking into consideration the time required for a new Chem-Trol manager to forge customer relationships, the two year time restriction is reasonable.

A geographic restriction of 250 miles, however, is much more unusual than that commonly used in Kansas noncompetition clauses.  Chem-Trol asserts that the large radius is required because of the distance for which a number of their customers services run.  It explains that with an REC, a right-of-way in which it is providing vegetation management may run for hundreds of miles, necessitating the greater milage restriction.  Also, both Mr. White and Mr. Christensen testified that it was not uncommon for Mr. Christensen to regularly travel not only throughout but even outside the 250 mile radius to service customers, indicating that the 250 mile restriction does not encompass Chem-Trol's entire service area.  Given the scope of Mr. Christensen's territory, the nature of the business, and the location of the Chem-Trol customers he serviced, the Court finds the 250 mile restriction reasonable.

**Effect of Covenant**

Although Mr. Christensen performed sales duties on behalf of both Chem-Trol and VMS, it is clear that he only had a covenant not-to-compete with respect to the type of work he performed for Chem-Trol.  Neither Mr. Christensen nor Midwest has any restrictions with respect to VMS.  Accordingly, the covenant not-to-compete shall be enforced as to Chem-Trol's customers, but not as to VMS' customers.  Chem-Trol introduced as Exhibit 33[34] a listing of its

---

[33]*Graham v. Cirocco*, 31 Kan. App. 2d 563, 570-71, 69 P.3d 194, 199 (2003).

[34]Exhibit 33 was filed under seal due to the confidential nature of Chem-Trol's customer list.

customers which were Mr. Christensen's accounts.  Mr. Christensen's covenant will be enforced solely against customers on that list, but only so long as the customer is within the 250 mile radius of Hamlin, Iowa.  The Court recognizes that the covenant also runs to prospective customers; however, Chem-Trol sponsored evidence that Mr. Christensen was not reaching out to prospective customers but was limiting his time to the REC market.  Chem-Trol introduced no evidence of who its prospective customers might be, and in the interests of not extending the Chem-Trol covenant to VMS customers and to provide certainty in enforcement of the covenant, the Court limits enforcement to those customers on Chem-Trol's Exhibit 33 that are within a 250 mile radius of Hamlin, Iowa.

**Bond Requirement**

Federal Rule of Civil Procedure 65©) requires a plaintiff to post a bond in an amount the Court deems appropriate to protect a defendant from damages or losses if, in the end, the defendant was wrongly enjoined.  As a requirement of the Temporary Restraining Order previously issued in this case, Chem-Trol posted a $10,000 bond.  However, based on the facts of this case, the Court finds that a bond of $50,000 for the preliminary injunction would be sufficient to protect defendants in the end if it is determined that they were improperly enjoined.

**IT IS ACCORDINGLY ORDERED** that Plaintiff Chem-Trol, Inc.'s Motion for Preliminary Injunction (Doc. 2) is hereby GRANTED, to the extent that Defendant Midwest Spray Team & Sales, Inc. and Defendant Christensen are enjoined from the following:

(1)     Soliciting or providing services in competition with services provided by Chem-Trol, or taking any actions to divert or attempt to divert such services, directly or indirectly, to any customer of Chem-Trol that is both identified in Exhibit 33 and

located within a 250 mile radius of Hamlin, Iowa.

(2)     Transmitting or revealing any information, written or oral, concerning the active or paid up accounts of Chem-Trol, or method of operation, or types of business forms of Chem-Trol to a competitor or use the same for himself or others in the same or similar employment; and

(3)     Divulging to any person, firm or corporation any information received by him during the course of his employment with regard to the personal, financial or other affairs of Chem-Trol and all such information shall be kept confidential and shall not in any manner be revealed to anyone.

**IT IS FURTHER ORDERED** that Plaintiff Chem-Trol, Inc. shall deposit a bond totaling $50,000 with the Clerk of the Court.

**IT IS SO ORDERED**.

Dated this 10th day of February, 2009, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

-22-